**STATE of Missouri, Respondent,**

v.

**Chad DAVIS, Appellant.**

**No. WD 50941.**

Missouri Court of Appeals,
Western District.

Submitted Aug. 6, 1997.

Decided Dec. 16, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 27, 1998.

Application for Transfer Denied
March 24, 1998.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Christine M. Blegen, Asst. Atty. Gen., Jefferson City, for respondent.

Before SMART, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

SMART, Judge.

After a jury trial in the Circuit Court of Jackson County, Chad Davis was convicted of first degree murder, § 565.020(1) RSMo 1994,[1] and armed criminal action, § 571.015(1), in connection with the killing of Critty Brown. In this consolidated appeal,

Davis appeals his convictions as well as the denial of post conviction relief under Rule 29.15. We affirm.

Davis does not dispute the sufficiency of the evidence to sustain his conviction for first degree murder. Viewed in the light most favorable to the verdict, the evidence at trial shows the following chronology of events. On January 5, 1991, Davis met Jeffrey Hudspeth, Alvon Turner, Brett Williams, and Andre Green at Green's house in Kansas City, Missouri. While there, Turner and Williams saw Davis carrying a gun in the waistband of his pants. The group decided to drive to Bannister Mall, a shopping mall. They drove in two cars, with Hudspeth and Turner riding in one car driven by Williams, and Green riding as a passenger with Davis in Davis' car.

When Davis and Green met Hudspeth's group at the mall, they brought with them Critty Brown, a fourteen-year old girl. Davis and Green informed the rest of the group that they intended to drive to Hickman Mills High School and told the others to follow them. Davis said he was going to Hickman Mills High School "to try to get him some."

After the group arrived at the high school, they drove around to a parking lot on the back side of the school. There they got out of their cars. Davis and Green were seen talking to Critty Brown before Green and Brown got into the back of Hudspeth's car. Green and Brown then appeared to the others to engage in sexual intercourse. Green exited the car, but when Brown, whose pants were off, tried to leave the car, she was prevented from doing so when Davis pulled his gun from his waist band and ordered Brown to get back into the car. Brown returned to the back seat of the car. Davis then got into the car and proceeded, apparently by force, to engage in sexual intercourse with Brown. Brown hollered repeatedly and told Davis several times to stop. After Davis emerged from the car, he pulled his pants, partly down, back up to his waist.

---

1. Unless otherwise specified, all statutory references hereafter are also to the Missouri Revised Statutes of 1994.

Brown got out of the car crying. The others testified that Brown appeared to be in a state of fright and nervous frenzy. She put on her shoes and wrapped her coat around herself, saying that she was going to walk to her aunt's house. Davis and Green told Brown that she did not need to go home yet, but Brown started walking across the neighboring football practice field toward some nearby apartments.

Williams suggested to Davis that he apologize to Brown. Davis said that they were going to have to kill Brown. Davis started jogging after Brown with Green following him. As Davis ran after Brown, he pulled out his gun. At this point, Hudspeth, Turner and Williams got into Hudspeth's car and prepared to leave. Turner and Williams heard a single gunshot and then saw Green, followed by Davis, run back to the parking lot from the practice field. Davis told Williams that he had just shot Brown. Later, Davis displayed a shell casing, which he described as a "souvenir" and a "trophy".

Brown's frozen body was found on the football practice field by a Hickman Mills High School teacher two days later. Her corpse was partially dressed, naked from the waist down except for her shoes and socks. Death was due to a gunshot, the bullet having entered below her right nostril and above her upper lip. A .44 magnum caliber expended bullet was recovered near the chain link fence around the practice field.

After being taken to Truman Medical Center, Brown's body was examined for evidence of sexual assault. Combing of Brown's pubic hairs revealed a pubic hair that would later be found to match those of Andre Green. A vaginal swab showed moderate levels of enzyme acid phosphatase, which is indicative of seminal fluid.

On January 16, 1991, Sarah Robinson, an ex-girlfriend of Williams, called the TIPS Hotline and reported that she heard Williams talking about the killing of Critty Brown. Robinson told police that Williams claimed to have shot Brown after hitting her in the face while Davis and Green raped her. As a result, a pick-up order was issued for Williams, and police contacted Hudspeth, Turner, Green, and Davis. All but Davis gave the detective videotaped statements.

Police recovered a .44 magnum caliber, Winchester Western Super brand shell casing from Andre Green's residence. The casing was from a fired bullet and was compatible with the bullet found on the field. Testimony from State's expert witness John Cayton, a firearms expert from the Regional Crime Laboratory, estimated that the bullet that killed Brown was fired from a gun held only one to two feet away from her.

On April 26, 1991, a Jackson County grand jury indicted Davis for first degree murder and armed criminal action. On July 21, 1993, the State gave notice that it intended to seek the death penalty on the grounds that the murder was committed (1) "for the purpose of avoiding, interfering with or preventing a lawful arrest or custody in a place of lawful confinement of himself or another", and (2) while the defendant "was engaged in the perpetration or was aiding or encouraging another person to perpetrate or attempt to perpetrate a felony of any degree of rape, sodomy, burglary, robbery, kidnapping or any felony offense in Chapter 195, RSMo."

According to Green's testimony at trial, after the group arrived in the parking lot, Hudspeth asked Brown to get into the car and then asked her whether she wanted to have sex with any of them. Brown said that she did not know if she wanted to have sex. Brown then refused Hudspeth's request for oral sex. Hudspeth got out of the car and Davis then asked Green if he wanted to have sex with Brown. Green said he would go ask Brown. Green claimed that Brown agreed to have sex with him because she liked him. After an unsuccessful attempt to have intercourse with Brown, Green left the car. Davis then got into the car with Brown. According to Green, during part of the time Davis was having sex with Brown, Williams was in the front seat of the car holding Davis' gun on Brown at Davis' behest.

Green testified that Brown repeatedly hollered and told Davis to stop. Green claimed that he then pulled Davis out of the car. Green stated that Brown promised not to tell anyone what had happened in the car.

Green testified that Davis pulled out his gun and said, "I don't believe her. I'm going to kill her." Green claimed that he tried to dissuade Davis, saying, "Don't do this. This ain't right." Green stated that Davis ignored him and moved toward Brown, with Green following him. Green claimed that Brown turned around to face Davis when she heard Davis come up behind her. According to Green, Brown yelled, "Stop, leave me alone." Green testified that Davis, his gun pointed at Brown, said he was sorry and then shot Critty Brown.

The State submitted the case to the jury on the theory that Davis was guilty either as a principal or an accomplice in the murder of Critty Brown. The jury found Davis guilty of first degree murder and armed criminal action. After the penalty phase of the trial, the jury recommended life imprisonment without parole. On March 22, 1995, the trial court sentenced Davis in accordance with the jury's recommendation.

On September 26, 1995, Davis filed a pro se Rule 29.15 motion requesting post-conviction relief. Counsel was appointed to represent Davis and an amended motion was filed on December 1, 1995. On April 12, 1996, the motion court (the Honorable David W. Shinn) held an evidentiary hearing on trial counsel's alleged ineffectiveness in various matters of trial strategy. The motion court issued findings of fact and conclusions of law denying Davis' Rule 29.15 motion on May 24, 1996. Davis now appeals both his conviction and the denial of his 29.15 motion.

## I. Appeal of Convictions

### A. Alleged Instructional Error as to Deliberation

█ Davis alleges that the trial court erred in overruling his objection and submitting Instruction Number 6, the first degree murder verdict director, to the jury. Davis claims that the instruction allowed the jury to find him guilty of first degree murder without finding that he deliberated. Davis also complains that the instruction was confusing to the jury. Instruction Number 6 resulted from the modification of MAI–CR

3d 313.02 by MAI–CR 3d 304.04, authorized by Note 7(b) to 304.04, and read as follows:

If you find and believe from the evidence beyond a reasonable doubt: First, that on or about January 5, 1991, in the County of Jackson, State of Missouri, the defendant or another person caused the death of Critty Brown, and Second, that defendant or the other person knew or was aware that his conduct was causing or was practically certain to cause the death of Critty Brown, and Third, that defendant or the other person did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, then you are instructed that the offense of murder in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the death of Critty Brown, the defendant acted together with, aided or encouraged another person in causing the death of Critty Brown and reflected upon this matter coolly and fully, then you will find the defendant guilty of murder in the first degree.

It is clear from reading the jury instruction that the jury was permitted to find Davis guilty of first degree murder only if they found either that he deliberated before himself causing the death of Critty Brown or that he deliberated before aiding or encouraging another person to cause the death of Critty Brown. Davis' argument that the instruction did not require a jury finding of deliberation is inconsistent with any reading of the instruction. Even if the Missouri Supreme Court had not already rejected precisely this argument in *State v. Richardson*, 923 S.W.2d 301, 318 (Mo. banc 1996), we would have no difficulty whatever in rejecting this allegation.

█ Under the same point, Davis contends that the disjunctive format of the instruction allowed the jury to "mix and match" elements without returning a unanimous verdict. This contention ignores the fact that the jury need only be unanimous as to the ultimate issue of the defendant's guilt or innocence of the crime charged. The jury

need not be unanimous as to the means by which the crime was committed. *State v. Hill,* 884 S.W.2d 69, 74 (Mo.App.1994).

■ As we will discuss at greater length below in our discussion of the submission of accomplice liability to the jury, the evidence in this case supported a finding that both Davis and Green were involved in the shooting of Critty Brown without unequivocally pointing to which of the two performed the final act that caused her death. Under these circumstances, submission of the first degree murder verdict director as modified by MAI–CR3d 304.04 was entirely proper and not erroneous. See MAI–CR3d 304.04, Notes on Use 7(b).

■ Having found Instruction Number 6 was not erroneous in that it conformed to the applicable Notes on Use, we need not address Davis' allegation that the instruction was prejudicial in that it had the potential to mislead or confuse the jury. *See State v. Jennings,* 761 S.W.2d 642, 644–45 (Mo.App. 1988). We see no reason to believe the instruction was inherently confusing.[2]

This point is denied.

## B. Gender–Based Batson Challenge

Davis next asserts a *Batson*[3] challenge to the composition of his jury, alleging that the State used peremptory challenges to remove two female panelists, Bettye Thomas and Floranne Long, based on gender. After a hearing, the trial court was satisfied with the neutrality of the State's explanation for its removal of Thomas and Frye and consequently overruled Davis' objection.

■ In response to a prima facie *Batson* challenge, the State must offer a neutral explanation for the peremptory strike. *State v. Sutherland,* 939 S.W.2d 373, 378–79 (Mo. banc 1997). The explanation is deemed neutral unless the explanation has an inherently discriminatory intent. *State v. Weaver,* 912

S.W.2d 499, 509 (Mo. banc 1995). Once the State has offered a neutral explanation for the peremptory strike, the burden shifts to the defendant to prove that the State's explanation was pretextual. *See State v. Smith,* 944 S.W.2d 901, 912 (Mo. banc 1997). Although the trial court considers the totality of facts and circumstances in determining whether the State's explanation is pretextual, a crucial factor is whether similarly situated venirepersons outside of the suspect class were subject to peremptory challenge by the State. *State v. Smulls,* 935 S.W.2d 9, 16 (Mo. banc 1996). We will not reverse the trial court's decision as to whether the prosecution discriminated in the use of peremptory challenges unless we find that the decision was clearly erroneous. *State v. Griffin,* 756 S.W.2d 475, 482 (Mo. banc 1988). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm impression that a mistake has been committed." *State v. Antwine,* 743 S.W.2d 51, 66 (Mo. banc 1987).

At the hearing, the State explained that it had used its peremptory strikes against the two panelists because the prosecutor sensed that both were hostile to the State's case. The gist of Davis' argument is that the explanations, although facially neutral, were merely pretextual, because male venirepersons not removed from the jury gave responses that did not differ from those given by Thomas and Long. We consider each strike separately.

1. Bettye Thomas

The State gave the following explanation for striking Thomas from the jury:

Ms. Thomas state [sic] during the death qualification portion of the jury [sic] that it would be very hard for her to realistically consider the death penalty. Although she gave many of the correct answers and

---

**2.** Davis points to a note the jury sent out during deliberations. Such a note does not prove that an instruction is inherently confusing. Moreover, the note dealt with the accomplice liability instruction rather than the first degree murder verdict director.

**3.** We refer, of course, to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which the United States Supreme Court held that state prosecutors could not use peremptory challenges to remove venirepersons on the basis of race. *Batson* was extended to gender discrimination in *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

certainly was not a proper subject for a strike for cause, it was our position or our belief after reviewing all her answers that she would—her position was contrary to that of the State in this. She also went to the point—went to the extent at one point, according to our notes, that she would want more then [sic] proof beyond a reasonable doubt on issues in the case because the death penalty was involved. Ms. Thomas also during questioning by the prosecution and the defense referred to the defendant as Chad, which indicated an identification with the defendant we believe is contrary to the State's best interests in selecting a jury in this case.

The defense claimed that the prosecutor mischaracterized Thomas' statements as to Thomas' reluctance to impose the death penalty, but the trial court ruled that the fact that Thomas referred to Davis by his first name was something that distinguished Thomas from the other jurors and sufficed as a race and gender-neutral explanation for the strike.

■ On appeal, Davis asserts that the trial court clearly erred in accepting the State's explanation, because Thomas' reference to Davis by his first name reflects a recognition that Davis was younger than Thomas. This was not the same objection Davis made at trial. More importantly, the defense's new interpretation of the significance of Thomas' reference to Davis by his first name is only one of many possible interpretations of the meaning of that reference. The voir dire transcript does not leave us with the firm impression that the trial court made a mistake in accepting the State's reading of the reference as reflecting Thomas' prejudicial identification with the defendant. In response to a question concerning whether the fact that she had a teenage daughter would affect her ability to be impartial, Thomas had answered: "I think cases have to be dealt with on the individual case. I can't say *Chad* had, you know, anything to do with my daughter. I just can't compare the two. I would have to judge him on the evidence that's presented" (emphasis added). As a matter of common experience, reference to a person by first name is consistent with familiarity or fondness for that person. We

cannot say that the trial court's ruling as to the removal of Thomas was clearly erroneous.

2. Floranne Long

The prosecution offered the following explanation for removing Long from the jury:

> Your Honor, this is the lady whose brother has been arrested, convicted, was presently in jail for passing bad checks. That together with—and I have to say to a certain extent one has to go with one's feelings. I had on speaking with her a bad feeling about whether she was going to be fair toward our position in the case. You know, again, this is not pretextual. It is a genuine feeling that people who have been charged with and convicted of crimes often hold some grudge against the State and its positions.

While there ensued a subsequent dispute as to whether Long had testified that her brother was still in jail for passing bad checks, the trial court considered the conviction itself to be an adequate and neutral basis for the strike. The defense then complained that male jurors with convicted family members had not been stricken, but when asked to name these jurors, the defense identified only Virgil Byrd. The prosecution pointed out that Byrd had said that he thought his brother deserved his punishment. The trial court agreed.

■ On appeal, Davis has not explained how the trial court's ruling was clearly erroneous. A venireperson's relationship to someone convicted of a crime is a sufficient, non-pretextual, neutral explanation for a peremptory strike. *See State v. Blankenship*, 830 S.W.2d 1, 15 (Mo. banc 1992). The transcript of voir dire clearly shows that Byrd thought his brother's convictions would in no way impinge on his ability to be impartial. When the State asked Byrd if he believed that his brother had been treated unfairly, Byrd answered: "No, I do not believe he was treated unfairly *because from everything that I can ascertain he was responsible for the things that he was charged with* (emphasis added)." In response to the ultimate question as to whether he would be able to be impartial despite what happened

to his brother, Byrd stated "I can definitely put it aside." While Long did answer that she would be able to be impartial despite her brother's stint in county jail, in contrast to Byrd she did not say anything about her brother being responsible for the crime with which he was charged. In the absence of such a statement, the trial court's reliance on the presumption that people who have had family members convicted of crimes will be biased against the State was not clearly erroneous.

This point is denied.

## C. Submission of Accomplice Liability to the Jury

Davis contends that the trial court erred when it submitted to the jury two instructions dealing with accomplice liability. Instruction Number 5 defined accomplice liability. Instruction Number 6 (already quoted above) was the verdict director for first degree murder, which as modified permitted the jury to find Davis guilty if it found that he caused or aided in causing the death of Critty Brown after deliberation. Davis argues that he had no notice that the State intended to go to the jury on accomplice liability until the instruction conference. Davis states that the indictment never alleged that he was an accomplice, and that the State throughout the trial tried to establish that Davis acted alone. The submission of these instructions, Davis argues, unfairly surprised him and prejudiced his trial, because

his defense throughout the trial was that Andre Green pulled the trigger.

 This point is without merit. The Missouri Supreme Court held that it was proper to submit accomplice liability to the jury despite having charged the defendant as a principal in *State v. Isa*, 850 S.W.2d 876, 898 (Mo. banc 1993). The reason is because Missouri long ago abolished the common law distinction between principals and accessories: "[a]ll persons who act together with a common intent and purpose in the commission of a crime are equally guilty." *Id. (citing State v. Goodman*, 482 S.W.2d 490, 492 (Mo.1972)). "An indictment or information may charge a defendant either as a principal or as an aider and encourager with the same legal effect." *Id. (citations omitted)*. While due process demands that the accused know enough about the crime charged to prepare an effective defense or raise the double-jeopardy bar, it does not require the State reveal all potential theories of the prosecution's case in the information or indictment.[4]

 Davis fails to persuade us that there was no indication at trial that the State intended to submit a theory of accomplice liability to the jury. While it is true that the tenor of the State's opening statement and subsequent questions was that Davis was the gunman, the defendant knew full well that the evidence as to the identity of the party pulling the trigger would be somewhat equivocal as between Green and Davis: witnesses saw Davis carrying the gun earlier that evening and reported that Davis later displayed

4. The Sixth Amendment of the United States Constitution, incorporated against the states through the Fourteenth Amendment, *Hodgson v. Vermont*, 168 U.S. 262, 268–71, 18 S.Ct. 80, 82, 42 L.Ed. 461 (1897), requires that the accused "be informed of the nature and cause of the accusation." Article I, § 18(a) of the Missouri Constitution gives the accused the right "to demand the nature and cause of the accusation." Federal and state court rules governing informations and indictments have long existed, and there is little if any case law as to the degree of specificity that is constitutionally required, at least where the conviction is for the crime charged. See Wayne R. LaFave and Jerold H. Israel, Criminal Procedure § 19.2 n. 62 (1984). In Missouri, the requirements for indictments and informations are set out in Rule 23.01. To be sufficient, an indictment or information must state inter alia (1) the essential facts constituting

the offense charged, (2) the time and place of the offense charged, (3) the section of the statutes alleged to have been violated, and (4) the name and degree of the offense charged. Rule 23.01(b)(2)-(5). The essential facts are usually supplied by the statute creating the offense charged in the indictment. In this case, the applicable statute was § 565.020(1). The present indictment alleged all the essential facts required for first degree murder, viz., that Davis knowingly caused the death of Critty Brown after deliberation upon the matter. Since Davis would be equally liable whether he pulled the trigger or whether he was an accomplice as defined by § 562.041(2), facts supporting accomplice liability were not an "essential" part of the offense charged. Liability as an accomplice was not a violation of a separate statute, nor does it alter the name or degree of the offense charged here.

the shell casing from the bullet that killed Critty Brown, referring to it as a "souvenir" or "trophy." Hudspeth testified that, after Brown left the car to walk to her aunt's house, he heard Davis say that they were going to have to kill Brown. Turner testified that he later heard Davis admit to killing Critty Brown. On the other hand, Hudspeth on cross-examination by the defense admitted that he told the police that he had heard that Green had a gun that evening, and he acknowledged that it was possible that Green rather than Davis threatened to kill Critty Brown. Police seized the shell casing from the bullet that killed Critty Brown at Green's house. Medical examination of Brown's body positively confirmed only that Green had sexual intercourse with Critty Brown. The only witness who testified that he saw Davis pull the trigger was Green, who was also the only other possible shooter.

Since the evidence showed that both Green and Davis were involved in the death of Critty Brown, but was less clear in showing specifically who shot Brown, this was a classic case for a disjunctive verdict director submitting principal and accomplice liability. *See State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). Defense counsel would have anticipated from the evidence that the State would need to go to the jury on alternative theories. This submission did not involve any surprises. The point is denied.

### D. Indirect Comment on Accused's Pre–Arrest Silence

Davis claims that the State improperly commented on his right to remain silent when Detective Devalkenaere, State's witness, testified, over defendant's objection, that he had taken statements from Williams, Hudspeth, Turner, and Green. Pointing out that his own name absent from the list of those who gave statements to the detective, Davis argues that the jury may have concluded that Davis chose not to speak to Detective Devalkenaere. Davis concludes that this amounts to a comment on the accused's silence that violates the Fifth Amendment.

 We disagree. These statements were all taken prior to Davis' arrest. Because Davis was a suspect at that time, the

jury would not necessarily assume the police had yet attempted to talk to Davis. Moreover, if Davis did refuse to talk prior to his arrest, such refusal would have been a pre-arrest silence. Pre-arrest silence is admissible over a Fifth Amendment objection. *State v. Bragg*, 867 S.W.2d 284, 292 (Mo.App.1993); *State v. Koster*, 684 S.W.2d 488, 491 (Mo.App. 1984); *see also State v. Lopez*, 836 S.W.2d 28, 34–35 (Mo.App.1992). The Fifth Amendment right to remain silent does not attach until the accused is in custody. *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966).

 In any event, Davis fails to show that the trial court abused its discretion in allowing the detective's testimony regarding the statements because Davis fails to show that the reference was the result of the calculated intent of the prosecution to magnify any decision of the accused not to speak. *See State v. Redman*, 916 S.W.2d 787, 793 (Mo. banc 1996). Specifically, we look to such factors as whether the testimony was deliberately elicited, whether the prosecutor pursued the subject further, and the extent to which the prosecutor attempted to draw attention to the fact of the defendant's silence. *See State v. Mabie*, 770 S.W.2d 331, 335 (Mo.App.1989). We accord great respect to the trial court's discretion in evaluating these factors in awarding or denying relief.

In the present case, it is true that the testimony was deliberately elicited by the State, but the other two factors are clearly absent. The State made no further reference to the fact that Davis had not given Detective Devalkenaere a videotaped statement. The only indirect reference to Davis' silence was the detective's explanation that he had taken statements from Hudspeth, Turner, Williams, and Green. In addition, the State did not attempt to draw attention to Davis' silence. In response to the defense objection, the State explained that the testimony was offered only in order to explain the course of the police investigation. Davis had been using the videotaped statements to impeach Hudspeth, Turner, and Williams. The detective's testimony simply explained how those videotaped statements had originated. The trial court was in a better position to

evaluate the State's purpose in offering the evidence, and we find no abuse of discretion. This point is denied.

## II. Denial of Post–Conviction Relief

### A. Trial Counsel's Failure to Call Two Prospective Witnesses

As his first point of error, Davis alleges that the motion court erred when it denied his Rule 29.15 motion that his trial counsel was ineffective for failing to call Cornelius Williams and Frederick Thomas as witnesses. Davis argues that these witnesses would have testified that Davis did not shoot Critty Brown.

Our review is limited to whether the motion court's findings of facts and conclusions of law are clearly erroneous. *Moore v. State*, 827 S.W.2d 213, 215 (Mo. banc 1992); Supreme Court Rule 29.15(j). Findings of fact and conclusions of law are clearly erroneous only if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made. *Moore*, 827 S.W.2d at 215.

In order to prevail on a claim of ineffective assistance of counsel, the movant must establish by the preponderance of evidence that (1) counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances, and (2) that there was a reasonable probability that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984).

To demonstrate that defense counsel was ineffective for failing to present the testimony of a particular witness, the movant must establish: (1) that the witness could have been located through reasonable investigation; (2) that the witness would have testified if called; and (3) that the testimony of the witness would have provided a viable defense. *State v. Vinson*, 800 S.W.2d 444, 448–49 (Mo. banc 1990). Trial counsel's decisions regarding the exclusion of witnesses, made after thorough investigation, are a matter of trial strategy and are "virtu-ally unchallengeable" in postconviction proceedings. *See State v. Ramsey*, 864 S.W.2d 320, 340 (Mo. banc 1993).

### 1. Frederick Thomas

In his post-conviction motion, Davis alleged that Frederick Thomas should have been called as a witness because he could have testified that Turner, Brett Williams, and Hudspeth told him that Davis did not kill Critty Brown. While Thomas did not testify at the evidentiary hearing, he did give a deposition in accordance with Rule 29.15, and this deposition was filed with the trial court.

In his deposition, Thomas stated that he was at Cornelius Williams' house and heard Turner and Green talking about the death of Critty Brown. Thomas claimed that he heard Turner and Green say that Davis "didn't do it." Thomas did not hear Turner or Green say whether Davis was present when Brown was killed.

### 2. Cornelius Williams

At the post-conviction evidentiary hearing, Cornelius Williams testified that he was with unidentified friends at a car wash at 77th Street and Troost when he thought he overheard Hudspeth, Turner, Brett Williams, and Green say that Davis "didn't do it." Williams admitted that he did not know to whom the declarants were talking. He did not remember the date of this alleged conversation. On cross-examination, Williams explained that he was at the car wash with a friend, but that his friend could not have overheard the conversation because he was playing loud music. The declarants did not say whether Davis was not present when Critty Brown was slain.

### 3. Review of the Motion Court's Denial of Relief

After considering the testimony of Thomas and Cornelius Williams, the motion court made the following findings and conclusions as to trial counsel's decision not to call them as witnesses:

Thomas indicated that he had heard Alvon Turner say that Movant did not shoot Critty Brown ... Thomas' deposition testimony contradicted his written statement, offered as an exhibit by Movant at the evidentiary hearing, in several respects.

Furthermore, the statement, on its face, is hearsay. The alleged declarant, Turner, did testify at Movant's trial. Under oath, Turner testified that he did not see the shooting ... At best, therefore, the statement could have been used in an attempt to impeach Turner.

Additionally, even if true, this testimony would not have provided Movant with a viable defense. The state submitted the case under a theory of accomplice liability and Thomas could not have testified that Movant was not present when Critty Brown was shot and killed ... Thomas could also not have testified, therefore, that Movant did not aid or encourage the person who shot Critty Brown. Thus, Thomas' testimony would not have provided Movant with a viable defense. Furthermore, Movant has failed to demonstrate that the outcome of his trial would have been different if Thomas had testified and is, therefore, unable to satisfy the prejudice requirement of his ineffective assistance of counsel claim.

Finally, Cornelius Williams testified at the evidentiary hearing that he overheard Andre Green, Brett Williams, Alvon Turner and Jeffrey Hudspeth talking at a car wash telling unidentified persons that Movant did not kill Critty Brown. Again, this is a hearsay statement and, at best, could have been used in an attempt to impeach the declarant or declarant at trial. In addition, Williams did not hear anyone say that Movant was not present when Brown was shot and killed or that Movant did not aid and encourage the person who shot Brown. Thus, under the state's theory of the case, and the instructions submitted to the jury, this testimony would not have provided Movant with a viable defense. Finally, Movant has not demonstrated that the outcome of his trial would have been different if only his trial attorneys had called Williams to testify.

The trial court also noted that defendant's counsel contacted all of these witnesses and interviewed them, obtaining statements. Williams subsequently refused to testify and recanted his testimony. The court concluded that, in view of the fact that none of the witnesses provided defendant with a defense, and any effort to use them would have been problematical, the decision not to call the witnesses was a sound strategy decision. On appeal, Davis does not explain how the motion court's findings and conclusions are erroneous, much less how they are clearly erroneous. The prospective testimony of both of the uncalled witnesses was hearsay that had little additional impeachment value with regard to the declarants and was most likely inadmissible as substantive evidence except to the extent the statements could have been attributed to Green.[5] Of prime significance is the fact that neither of the statements would have been of much value in exculpating Davis as an accomplice. Neither Thomas nor Williams would have been particularly credible as a witness. On cross-examination, at the motion hearing, Davis' trial counsel admitted that the testimony of both witnesses differed from the sworn statements that they had given the private detective, statements which were contained in the defense files. While on direct examination trial counsel did not recollect having reviewed these files, on redirect examination he stated

---

**5.** Since Green testified at trial that Davis shot Critty Brown, any earlier statement he made to the effect that Davis did not shoot Brown would have been admissible over the hearsay obstacle as a prior inconsistent statement under § 491.074. Of course, even as substantive evidence such an earlier inconsistent statement by Green would not have helped get Davis off the hook as an accomplice. Insofar as the statements are attributable to Brett Williams, Turner, or Hudspeth, they most likely do not qualify as prior inconsistent statements, since none of the other declarants later testified that Davis shot Critty Brown. In fact, they all testified that they tried to leave the scene before the shooting in Hudspeth's car and did not see the shooting itself. For a statement to qualify as a prior inconsistent statement, the "whole impression and effect" of the statement must be to present a "real inconsistency" between that statement and a later statement. *State v. Dunn*, 731 S.W.2d 297, 300 (Mo.App.1987). Any prior statements by Brett Williams, Hudspeth, or Turner to the effect that Davis did not shoot Brown would not be inconsistent with later testimony that they did not see whether Davis or Green shot Brown, since they need not have seen the shooting to arrive at a conclusion regarding who pulled the trigger. And again, as substantive evidence the statements would not exculpate Davis as an accomplice.

that it was his normal practice to do so. We cannot conclude that the motion court was clearly in error in concluding that Davis' trial counsel refused to call both witnesses as a matter of professionally sound trial strategy. In addition, Davis has failed to show how the motion court erred in finding that trial counsel's failure to call Thomas and Williams as witnesses in no way prejudiced his defense.

This point is denied.

### B. Motion Court's Refusal to Grant Evidentiary Hearing as to Miscellaneous Claims of Ineffective Trial Representation

In his final point, Davis alleges that the motion court erred in dismissing three of his ineffective assistance claims without an evidentiary hearing. The motion court dismissed without evidentiary hearing Davis' claims that counsel was ineffective for: (1) calling Andre Green as a defense witness, (2) discouraging Davis from testifying on his own behalf, and (3) not using peremptory strikes on two jurors.

Before addressing Davis' specific claims, we note that the movant under Rule 29.15 is entitled to an evidentiary hearing only if (1) the movant pleads facts, not conclusions, that if true would warrant relief, (2) those facts are not refuted by the files and records in the case, and (3) the matters complained of prejudiced the movant. *White v. State,* 939 S.W.2d 887, 893 (Mo. banc 1997).

Davis first argues that the motion court erred in not holding an evidentiary hearing on whether his trial counsel was ineffective for calling Andre Green, the other possible shooter, as a defense witness. The reason, Davis urges, is that it "makes no sense that counsel would call a witness to testify for the defense, knowing that the witness would be the only person to claim to have actually witnessed the charged homicide."

The selection of witnesses is a matter of trial strategy, and as such it is rarely if ever the basis for finding ineffective assistance of counsel. *See Sanders v. State,* 738 S.W.2d 856, 858 (Mo. banc 1987). Davis therefore has not shown that he pleaded any facts entitling himself to relief. Further-more, the record refutes Davis' claim that counsel was ineffective for calling Green. Contrary to what Davis urges, it made sense for trial counsel to call Green as a witness. Even with the knowledge that Green would testify that Davis shot Brown, defense counsel sought to show through cross-examination of Green, the only other possible shooter, that Green was not a credible witness, thereby necessarily raising doubt that Davis was the shooter or was even involved in the shooting. Although proving that he was not the shooter through hostile examination of Green would not excuse Davis from liability as an accomplice, it was (and may indeed have been) important in avoiding the death penalty the State sought. Finally, Davis has not explained how the decision to call Green necessarily prejudiced his defense. Davis was not entitled to an evidentiary hearing on counsel's decision to call Green as a witness.

The second ineffective assistance claim that the motion court dismissed without a hearing was Davis' allegation that counsel "strongly discouraged" Davis from testifying in his own defense unless he was prepared to admit some involvement in the shooting. However, even according to Davis' motion, trial counsel did not refuse to call him as a witness. Trial counsel's advice to Davis not to testify was therefore yet another decision as to trial strategy which the motion court correctly refused to second-guess. *See State v. Kennedy,* 842 S.W.2d 937, 945 (Mo.App.1992). Davis thus did not plead any fact entitling himself to relief. Moreover, Davis has shown no prejudice from his decision not to testify. While taking the witness stand would have given Davis the opportunity to explain that he had nothing to do with the shooting, the decision to testify would have been fraught with peril. Trial counsel was clearly aware of these risks.

Lastly, the motion court dismissed Davis' allegation that trial counsel was ineffective for not using peremptory strikes against venirepersons Linda Walker and Willie McCann. To prevail on such a claim, the movant must show that a juror who was actually biased sat on the petit jury.

*See Presley v. State,* 750 S.W.2d 602, 607 (Mo.App.1988), cert. denied, 488 U.S. 975, 109 S.Ct. 514, 102 L.Ed.2d 549 (1988). Davis failed to plead actual bias on the part of these jurors in his final amended Rule 29.15 motion. Nothing in the record suggests that trial counsel was ineffective for failing to strike Walker and McCann. Davis has not shown how counsel's failure to use peremptory strikes against Walker and McCann on the jury prejudiced the outcome of his case.

This point too is denied.

### III. Conclusion

We affirm Chad Davis' convictions for first degree murder and armed criminal action. We also affirm the denial of Davis' Rule 29.15 motion on all of the appellant's ineffective assistance claims.

LAURA DENVIR STITH and LOWENSTEIN, JJ., concur.