

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

TAQWA THOMPSON, )
)
    Appellant, ) WD75688
)
vs. ) Opinion filed: March 25, 2014
)
STATE OF MISSOURI, )
)
    Respondent. )

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE DAVID M. BYRN, JUDGE**

Before Division Three: Anthony Rex Gabbert, Presiding Judge,
Victor C. Howard, Judge and Thomas H. Newton, Judge

Taqwa Thompson appeals the judgment of the motion court denying his Rule 29.15 motion for postconviction relief following an evidentiary hearing. Thompson sought to vacate his convictions for second-degree murder and armed criminal action and concurrent sentences of twenty years and five years imprisonment, respectively. He claims that the motion court clearly erred in denying his motion because he received ineffective assistance of counsel when counsel failed to request an instruction for a lesser included offense, failed to strike a venireperson, and failed to adequately cross-examine or impeach the chief medical examiner. The judgment is affirmed.

**Factual and Procedural Background**

Thompson was convicted of murder in the second degree and armed criminal action and sentenced to twenty years and five years imprisonment, respectively. Viewed in the light most favorable to the verdict, the evidence at trial showed the following. On April 2, 2008, Thompson, Markest Scott, and a person known as T.J. were walking down North Mersington in Kansas City. Thompson broke away from the other two men and crossed the street where the victim, Ricardo Jimenez, was walking toward an apartment building. A resident of the building observed Thompson, wearing a Kansas City jacket and a red cap, enter the building behind the victim. Another resident also noticed Thompson entering the building, wearing the Kansas City jacket and red cap. Thompson walked up as the victim was entering the building and shot him. The victim said, "He shot me," and fell in the doorway. A building resident called 911, but the victim died in a matter of minutes and was pronounced dead at the scene.

Thompson rejoined Scott, and they ran off together. T.J. ran in a different direction. Thompson tried to give the gun to Scott, but he wouldn't take it.

One of the building residents described Thompson and Scott to Aaron Stanley, who was in the building. Stanley got in his vehicle and drove in the direction that the two men had gone. Stanley saw two men matching the description and called the police.

The police found Thompson and Scott standing on a bridge at Lexington and Lebelle. When he saw the police, Thompson put the gun in his red baseball cap and threw it off the bridge. Thompson and Scott were arrested, and Scott showed the police where the red cap was. The police found the gun inside the cap; the Kansas City jacket was on the sidewalk. DNA profiles from the trigger, the cap, and the jacket matched Thompson.

2

Thompson told police that he did not know the victim and that he had not been north of St. John Avenue that day. The scene of the shooting, 207 North Mersington, is about two blocks north of St. John Avenue. Thompson did not mention an accidental shooting of the victim and did not indicate any knowledge of the shooting or any familiarity with the victim.

During voir dire, the prosecutor asked the panel if anyone was familiar with the area of 207 Mersington in Kansas City where the shooting occurred. Venireperson No. 3 responded that she was:

> VENIREPERSON NO. 3: I kind of know the area. I don't live there, but I kind of know where stuff is. But I don't live near there.
>
> PROSECUTOR: Okay. Anything about the fact that you're aware of this circumstance, would that affect your ability to be fair and impartial in this case?
>
> VENIREPERSON NO. 3: Yes.[1]
>
> PROSECUTOR: Okay, thank you. Anyone else? I see no other hands.

Neither party followed up with further questioning of Venireperson No. 3, and defense counsel did not move to strike her.

At trial, the chief medical examiner, Dr. Mary Dudley, testified about the cause and manner of the victim's death. In forming her conclusions about these matters, Dr. Dudley reviewed the autopsy report prepared by Dr. Laura Knight, the deputy medical examiner who performed the autopsy. Dr. Dudley explained that the bullet entered the back of the victim's right shoulder, passed through the posterior right shoulder, the posterior or back fourth rib, and the right lung, and grazed the right side of the heart. The trajectory of the bullet, going through the right shoulder, was downward and forward. The bullet was recovered on the front of the chest on the right side.

---

[1] The motion court later found the transcript incorrect and Venireperson No. 3 had actually responded, "No."

During cross-examination by defense counsel, Dr. Dudley admitted that she did not conduct the autopsy, was not present for the autopsy, and never viewed the body. She also testified that she could not tell how far the gun was from the victim's body when he was shot but that she "would call it a distant range wound" because there was no soot in or around the wound and no burnt or unburnt gunpowder stippling around the wound. Dr. Dudley admitted, "even if there was clothing there, that may make a difference on what's deposited, you know, on the jacket." Dr. Dudley also admitted that Dr. Knight concluded that the gunshot wound was "penetrating, indeterminate range." Finally, Dr. Dudley again admitted that she never saw the body, was not present for the autopsy, and never personally viewed the gunshot wound.

In response to counsel's cross-examination, the State again elicited on re-direct that Dr. Dudley concluded that the wound was a "distant range wound" based on "the wound pattern, that there was no soot or stippling." She concluded that the weapon was held "at least an arm's length away or over two feet from being in contact with the body." Dr. Dudley testified that when she did her independent analysis, she had the autopsy report, photographs, and clothing recovered from the victim.

On re-cross-examination, defense counsel once again elicited that Dr. Knight performed the autopsy and concluded that the wound was an "indeterminate range gunshot wound."

Thompson offered testimony at trial to support his claim that he accidentally shot the victim while acting in self-defense. He explained that the day before, a friend gave him a gun that the friend had found. The friend said that he did not think the gun was worth anything because it did not have a clip. Thompson asked if he could have the gun and told his friend that he could probably sell it to somebody and make some money. Thompson testified that he was looking at the gun a little later and that the victim walked by, said, "Hi," and asked to hold the

4

gun.  Thompson refused but told him he could buy it for twenty or thirty dollars because it did not have a clip.  The victim agreed to buy the gun, and they agreed to meet the next day. Thompson said that while he had the gun, he never fired it or test fired it.

Thompson testified that the next day, he happened so see the victim walking toward the apartment building.  He walked over and asked if he still wanted to buy the gun.  The victim said that he did and told Thompson "to meet him inside an apartment building so nobody sees us making the transaction."  Thompson followed the victim into the building.

Thompson said that, once inside, he "pulled out the gun ready to make the transaction." The victim "tried to reach for the gun."  Thompson "tried to turn around and leave," but the victim grabbed the back of his jacket.  Thompson tried to pull away, said "let me go," but the victim would not let go.  Thompson testified that he then "tried to pull away with the gun," and that "when [he] was trying to pull away at the same time, [his] finger slipped and hit the trigger and the gun went off."  He explained that his coat was loose, "so [he] was halfway almost facing him."  He said, "So when I reached around, he had moved a little bit so I couldn't hit him and my arm reached around and I tried to push off.  That's when my finger hit the trigger and the gun discharged."  Thompson further explained that the victim was crouched down and that the gun never touched the victim.  He said that when the victim told him that he had shot him, "I was "shocked, because I didn't believe there was no bullet in the gun."  He said, "From my knowledge, that's what was told to me, so I was shocked."  He said that his friend "got the gun with no clip," so he "didn't believe there was a bullet in there with no clip."

After shooting the victim, Thompson panicked and took off running.  He admitted that he put the gun in his hat and dropped it off a bridge.  He also admitted that he lied to the police,

5

explaining that he "was scared and [he] didn't know what else to do." Thompson testified that he did not intend to shoot the victim and that he did not intend to harm him.

On cross-examination, Thompson testified that when the victim would not let go of his jacket, he "tried to swing around and hit him with the gun." He said that he missed and "kind of jerked back," and he guessed his "finger hit the trigger and the gun went off." He said that he was trying to hit the victim "[t]o loosen up his grip a little bit to where [he] can pull away and leave."

After the close of the evidence, defense counsel argued for a self-defense instruction. Counsel also argued that the self-defense instruction should instruct the jury on the use of non-deadly force "because from our view, [Thompson] did not intend to use deadly force." The trial court agreed to submit a self-defense instruction that included the non-deadly force language. The trial court also submitted Thompson's instruction on the lesser included offense of involuntary manslaughter.

In closing argument, defense counsel argued that the State had not proved that the "this was an intentional shooting." Counsel argued:

> Mr. Jimenez was grabbing him by the jacket and pulling him down. Mr. Thompson had a very small gun, that he believes is unloaded. And he simply tries to strike him. That is lawful self-defense. Do not be fooled by the fact that the gun went off. It could have been a cell phone in his hand. It could have been a book in his hand. It could have been anything. He still has the right to do that. It happened that the gun discharged. But he didn't intend that. He did not intend to use deadly force.

Defense counsel then argued that if the jury thought Thompson had been reckless, then he was guilty of involuntary manslaughter. Counsel stated, "At worst, it was reckless for him to go over there with a gun. But I will submit to you that he did not know there was a live round in that gun."

6

The jury found Thompson guilty of second degree murder and armed criminal action, and the trial court sentenced him to concurrent sentences of twenty years and five years imprisonment, respectively. This court affirmed the convictions and sentences on direct appeal. *State v. Thompson*, 336 S.W.3d 211 (Mo. App. W.D. 2011).

Thereafter, Thompson filed a *pro se* Rule 29.15 motion for postconviction relief. Appointed counsel filed an amended motion on Thompson's behalf. The amended motion alleged, in pertinent part, that trial counsel was ineffective in failing to request an instruction for the lesser included offense of voluntary manslaughter; failing to strike Venireperson No. 3, who had indicated that she could not be fair and impartial; and failing to adequately cross-examine or impeach the chief medical examiner's opinion that the victim's wound was a "distant range wound."

The motion court held an evidentiary hearing on Thompson's motion. Defense counsel testified that the defense strategy was that Thompson had shot the victim in self-defense—that "in defending himself, that the gun accidently was discharged." She stated that "our theory was that he was under the belief that the gun was not loaded." That belief, she said, was based on the fact that "the magazine or the clip" was missing from the gun. Defense counsel also testified that the defense requested an instruction on self-defense and on the lesser included offense of involuntary manslaughter. She did not recall whether she considered requesting an instruction for voluntary manslaughter. When asked if an instruction on voluntary manslaughter would have been inconsistent with the defense strategy of an accidental shooting in response to being attacked, or in self-defense, she said, "No, I guess not." On cross-examination, defense counsel testified that the self-defense claim "was not shooting him in self-defense," rather the claim "was mixed up in another self-defense claim." She testified that she submitted involuntary

7

manslaughter because she wanted to be able to argue that "if it wasn't self defense, it was reckless." She explained that the defense never admitted "to the jury that the shooting, itself, was an intentional shooting," and that she did not want the jury to believe that the shooting was intentional. She stated that it was not the defense theory to argue an intentional shooting "[i]n the heat of passion."

Defense counsel further testified that if the transcript were correct, she would have wanted to strike Venireperson No. 3 for cause. On cross-examination, she testified that her notes indicated that Venireperson No. 3 had responded in the negative when asked if her familiarity with the area would keep her from being fair and impartial. She stated that her co-counsel's notes also indicated that the venireperson had answered no. She also testified that if Venireperson No. 3 had responded that she could not be fair and impartial, she would have followed up by moving to strike her from the jury. On re-direct, counsel clarified that her notes did not actually indicate that the venireperson had answered no but read verbatim, "Three, know area, don't live there, F&I," with F&I meaning that the venireperson would be fair and impartial.

The State presented the testimony of Bryan Covinsky, an assistant prosecutor in Jackson County, and Jennifer Phillips, a trial team leader at the Jackson County Prosecutor's Office. Covinsky testified that he did the questioning during voir dire in this case and that his notes indicated that Venireperson No. 3 could be fair and impartial despite being familiar with the area. He explained that if she had indicated that she could not be fair and impartial, he would have followed up with additional questions. Phillips testified that her notes indicated that the venireperson said that she could be fair and impartial and that there were no follow up questions based on her response. On cross-examination, Phillips stated that she thought the trial transcript was incorrect in reporting Venireperson No. 3's response.

8

The motion court also made a record at the evidentiary hearing about the notes it had taken during voir dire. The court's notes indicated that Venireperson No. 3 "Generally knows the scene." The notes also included the notation "FI," which meant "her answer indicated to me that she could be fair and impartial." The motion court also stated that it had listened to the audio transcript of the proceedings and that it believed the venireperson answered no when asked if her familiarity with the scene would affect her ability to be fair and impartial. The court further stated that other staff members listened to the tape and some agreed that the venireperson said no and some believed she said yes. It observed that there was a lot of background noise on the tape.

The motion court denied Thompson's motion for postconviction relief. This appeal by Thompson followed.

**Standard of Review**

In his three points on appeal, Thompson claims that the motion court clearly erred in denying his motion for postconviction relief because he received ineffective assistance of counsel. Appellate review of the denial of a postconviction motion is limited to determination of whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k); *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009). Findings of fact and conclusions of law are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite and firm impression that a mistake has been made. *Zink*, 278 S.W.3d at 175 (quotes and citations omitted).

On a claim of ineffective assistance of counsel, the burden is on the movant to prove by a preponderance of the evidence that (1) counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances and (2) counsel's

9

failure prejudiced him. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A strong presumption exists that counsel's conduct was reasonable and effective. *Id.* at 176. To show prejudice, the movant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.*

### Failure to Request Instruction for Lesser Included Offense

In his first point on appeal, Thompson contends that counsel was ineffective in failing to request an instruction for the lesser included offense of voluntary manslaughter because the evidence would have supported such theory. To establish a claim of ineffective assistance of counsel for failure to request a lesser included instruction, a movant must show that the evidence supported submission of the instruction had one been requested, the decision not to request the instruction was not reasonable trial strategy, and the movant was thereby prejudiced. *McNeal v. State*, 412 S.W.3d 886, 889 (Mo. banc 2013); *Brock v. State*, 242 S.W.3d 430, 433 (Mo. App. W.D. 2007). "If counsel made an objectively reasonable choice not to submit an available instruction, the decision would not constitute ineffective assistance of counsel." *Brock*, 242 S.W.3d at 433. "It is a tactical decision usually based on the belief—often a reasonable one— that the jury may convict of the lesser offense, if submitted, rather than render a not guilty verdict on the higher offense if the lesser is not submitted." *Hendrix v. State*, 369 S.W.3d 93, 100 (Mo. App. W.D. 2012)(internal quotes and citation omitted).

"The crime of voluntary manslaughter is defined as causing the death of another person under circumstances that would constitute murder in the second degree, except that the death was caused 'under the influence of sudden passion arising from adequate cause.'" *State v. Redmond*, 937 S.W.2d 205, 208 (Mo. banc 1996)(quoting section 565.023, RSMo 2000). "Sudden passion" is "passion directly caused by and arising out of provocation by the victim or another acting with

the victim which passion arises at the time of the offense and is not solely the result of former provocation." § 565.002(7), RSMo 2000. "Adequate cause" is "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." § 565.002(1), RSMo 2000.

Even if the evidence supported an instruction for the lesser included offense of voluntary manslaughter, which is not decided here, the motion court's judgment was not clearly erroneous because Thompson failed to overcome the presumption that counsel's decision not to request the instruction was reasonable trial strategy. The defense theory at trial was that Thompson acted in self-defense and used only what he thought was non-deadly force in trying to free himself when the victim grabbed him. The defense evidence was designed to show that Thompson did not know that the gun was loaded and that he was merely trying to get away from the victim when his finger inadvertently hit the trigger of the gun. In closing argument, defense counsel argued that Thompson was acting in self-defense when he tried to strike the victim after being grabbed, didn't know the gun was loaded, and "did not intend" for the gun to discharge and "did not intend to use deadly force." She then argued that if the jury thought Thompson had been reckless, he was guilty of involuntary manslaughter, conceding, "At worst, it was reckless for Mr. Thompson to go over there with a gun."

Counsel further confirmed at the evidentiary hearing that the defense strategy at trial was that Thompson had accidently shot the victim in self-defense, believing that the gun was not loaded. Although she initially answered, "No, I guess not" when asked if a voluntary manslaughter instruction would have been inconsistent with the defense strategy, she explained on cross-examination that the defense never admitted "to the jury that the shooting, itself, was an intentional shooting," and that she did not want the jury to believe that the shooting was

11

intentional. She stated that it was not the defense theory to argue an intentional shooting "[i]n the heat of passion." She further testified that she submitted involuntary manslaughter because she wanted to be able to argue that "if it wasn't self defense, it was reckless." Under these circumstances, requesting a voluntary manslaughter instruction would have been inconsistent with the defense's theory. "Counsel 'had no duty to request an instruction that would undermine the entire theory of the case presented at trial.'" *McKee v. State*, 336 S.W.3d 151, 154 (Mo. App. E.D. 2011)(quoting *Brock*, 242 S.W.3d at 434). The motion court did not clearly err in denying this claim of ineffective assistance of counsel. The point is denied.

### Failure to Strike Venireperson No. 3

In his second point on appeal, Thompson claims that counsel was ineffective in failing to strike, for cause or with a peremptory strike, Venireperson No. 3. He asserts that, according to the transcript, the venireperson gave a response during voir dire that indicated that she could not be fair and impartial due to her familiarity with the crime scene and that prejudice is presumed because a biased juror sat on the jury.

To prevail on a claim of ineffective assistance of counsel for failure to strike a venireperson, the movant must show that a juror who was actually biased sat on the jury. *Byrd v. State*, 329 S.W.3d 718, 723 (Mo. App. S.D. 2010)(citing *State v. Davis*, 963 S.W.2d 317, 330 (Mo. App. W.D. 1997)). "A possibility of prejudice is not sufficient to disqualify a juror: 'It must clearly appear from the evidence that the challenged venireperson was in fact prejudiced.'" *Pearson v. State*, 280 S.W.3d 640, 646 (Mo. App. W.D. 2009)(quoting *State v. Walton*, 796 S.W.2d 374, 377 (Mo. banc 1990)). "If a venireperson unequivocally indicates an ability to evaluate the evidence fairly and impartially, trial counsel is not ineffective for failing to seek removal." *Id.*

12

In denying this claim of ineffective assistance of counsel, the motion court initially found that "the transcript is in error and that the notes and collective memories of all trial counsel, along with the Court, that venireperson number 3 indicated that her knowledge of the location of the alleged crime would *not* affect her ability to be fair and impartial, are accurate."[2] Thompson argues that the State waived any claim that the transcript was inaccurate by failing to dispute it as required by Rule 30.04(g) during the direct appeal.

Thompson relies on two cases, *State v. Davis*, 573 S.W.2d 114 (Mo. App. 1978), and *Shaw v. State*, 347 S.W.3d 142 (Mo. App. S.D. 2011), to support his argument. In *Davis*, the trial court approved the accuracy of a trial transcript after the prosecutor refused to approve it; and, on direct appeal, this court stated that it was "bound to accept the version [of the prosecutor's closing argument] contained in the transcript approved by the trial court." 573 S.W.2d at 116.

In *Shaw*, the sentencing hearing transcript indicated that the court had orally pronounced and imposed concurrent sentences while the written judgment later indicated that the sentences were consecutive. 347 S.W.3d at 144. Shaw filed a Rule 24.035 motion to correct the written judgment to conform to the oral pronouncement. *Id.* Evidence was presented at the evidentiary hearing that the judge's and defense counsel's notes indicated the sentences were to run consecutively, the transcript showed concurrent sentencing, and the written sentence and judgment issued showed consecutive sentences. *Id.* The motion court also stated, "I thought I had sentenced him to consecutive sentencing" and that the Court of Appeals would have to resolve whether the transcript or written judgment controlled. *Id.* The motion court ultimately

---

[2] The motion court further found that even if the transcript were correct, Thompson failed to prove that he was prejudiced because the venireperson's response did not indicate which party would potentially be favored or disfavored.

13

denied Shaw's motion, stating in its judgment, "The record in the case below is contradictory in terms of whether said sentences were to run concurrently or consecutively." *Id.* at 145.

In reversing the motion court's judgment and remanding for correction of the written judgment, the Southern District recited the well-settled proposition that "the written sentence and judgment in a criminal case may not deviate from the court's oral pronouncement of sentence" and if it does, the oral sentence controls and the written judgment is erroneous. *Id.* (citing *Hastings v. State*, 308 S.W.3d 792, 796 (Mo. App. W.D. 2010), and *State v. Patterson*, 959 S.W.2d 940, 941 (Mo. App. E.D. 1998)(internal quotes omitted)).

The Southern District also rejected the State's argument on appeal that that motion court had "implicitly found" that there was an error in the transcript:

> The motion court made no such express finding. Based upon our review of the transcript from the evidentiary hearing, we find no support whatsoever for the State's argument that the judge made an implicit finding to that effect. In point of fact, what the judge said was that he 'thought' he had imposed consecutive sentences. He never stated that the official transcript was in error.

*Id.* at 146. It further stated that because the State failed to follow the procedure for challenging the accuracy of a transcript in Rule 30.04(g), the appellate court was bound by the certified transcript from the sentencing hearing, which clearly stated that Shaw's sentences were to run concurrently. *Id.* Specifically, Rule 30.04(g) provides:

> If there is any dispute concerning the correctness of any legal file or transcript, or if the parties fail to agree within a reasonable time as to its correctness, the legal file or transcript shall be settled and approved.

The Southern District explained that if the State believed there was an error in the transcript from the sentencing hearing, it was essential for the State to ask the motion court to settle and approve the transcript under the rule. *Shaw*, 347 S.W.3d at 146. It continued, "the motion court could have held a hearing and heard testimony from court reporter Matthews concerning her notes

14

relating to the sentencing hearing (and perhaps a backup tape-recording as well) to ascertain whether there was, in fact, any error in the transcript she prepared." *Id.*

Unlike in *Shaw*, the State in this case did challenge the accuracy of the transcript within a reasonable time after the dispute arose, and the motion court expressly found that the transcript was incorrect. At the evidentiary hearing, the State presented evidence that all of the attorneys at Thompson's trial, defense counsel and the two prosecutors, thought that Venireperson No. 3 indicated she would be fair and impartial. Likewise, the motion court noted on the record that after reviewing its notes on voir dire and the audiotape of the trial, it believed that the venireperson had said she could be fair and impartial. In its amended judgment, the motion court found that the transcript was incorrect and the notes and collective memories of all trial attorneys and the court was accurate regarding the venireperson's response. The dispute about the transcript arose in this case after Thompson raised counsel effectiveness for failing to strike Venireperson No. 3. At that point, the motion court stepped in and resolved it in compliance with Rule 30.04(g). The motion court may believe or disbelieve any evidence; therefore, this court defers, and is bound, to accept the motion court's determination that the transcript was in error and that Venireperson No. 3 had indicated that she would be fair and impartial. *Byrd*, 329 S.W.3d at 724; *Davis*, 573 S.W.2d at 116. Because Venireperson No. 3 was not biased, defense counsel was not ineffective in failing to strike her. *Pearson*, 280 S.W.3d at 646. The motion court did not clearly err in denying this claim of ineffective assistance of counsel. The point is denied.

### Failure to Impeach Chief Medical Examiner

In his final point on appeal, Thompson claims that counsel was ineffective in failing to impeach Dr. Dudley's expert opinion that the victim's wound was a "distant range wound" with

the conclusions of Dr. Knight, the deputy medical examiner who performed the autopsy, that the range of fire could not be reliably determined because the victim's dark clothing may have obscured any soot or gunpowder. Thompson argues that Dr. Dudley's testimony about a "distant range wound" undermined his defense that he accidently shot the victim at close range while they were struggling; therefore, reasonably competent defense counsel would have refuted such testimony with Dr. Knight's conclusions that the wound was an "indeterminate range gunshot wound." He further argues that had counsel adequately cross-examined Dr. Dudley, there is a reasonable likelihood of a different outcome at trial.

The failure to impeach a witness will not constitute ineffective assistance of counsel unless such action would have provided a viable defense or changed the outcome of the trial. *State v. Ferguson*, 20 S.W.3d 485, 506 (Mo. banc 2000). Contrary to Thompson's argument, defense counsel did cross-examine Dr. Dudley about her opinion that the victim's wound was a "distant range wound." She elicited evidence that could have potentially undermined Dr. Dudley's opinion in the minds of the jurors including evidence that Dr. Dudley did not perform the autopsy, was not present for the autopsy, and never saw the victim's body or the gunshot wound, and that Dr. Knight, who did perform the autopsy, classified the wound was as an "indeterminate range gunshot wound." Thompson did not meet his burden of showing that additional or different cross-examination or impeachment would have changed the outcome of the trial. The motion court did not clearly err in denying this claim of ineffective assistance of counsel. The point is denied.

The judgment of the motion court is affirmed.

VICTOR C. HOWARD, JUDGE

All concur.

16