**STATE of Missouri, Respondent,**

v.

**Arthur S. THOMPSON, Appellant.**

**No. WD 59840.**

Missouri Court of Appeals,
Western District.

May 20, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 1, 2003.

Application for Transfer Denied
Aug. 26, 2003.

Michael S. Askinosie, Teresa Grantham, Springfield, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, John Munson Morris, Breck Burgess, Attorney General Office, Jefferson City, for respondent.

RONALD R. HOLLIGER, Judge.

Arthur Scott Thompson appeals from his conviction and sentence to life in prison without the possibility of parole for first-degree murder (§ 565.020, RSMo 2000). Thompson raises ten points on appeal including the sufficiency of the evidence, errors in evidentiary rulings and voir dire, and two points of claimed instructional error. We find that the court properly denied Thompson's motion for judgment of acquittal but erred in failing to follow the Notes on Use under MAI–Cr 3d 304.04 and to modify the verdict director on first-degree murder. We discuss the remaining points to the extent that they are likely to reoccur at retrial.

## Facts

As Thompson challenges the sufficiency of the evidence, the evidence viewed in the light most favorable to the verdict is as follows:

Thompson was a member of a gang led by Andrae Kirk in Bolivar, Missouri. Other members of the gang included Mike Sutton (the murder victim), Jason Huber, and Mark Rich. About five weeks before Sutton's murder, Kirk told Thompson that Sutton could not be trusted and needed to be killed. This discussion took place in front of Huber and a woman named Lillie White. When Kirk indicated that Sutton needed to be killed, Huber and White nodded their heads in agreement.

On August 17, 1998, two gang members asked Thompson if they could borrow his car to take Sutton to Kirk's house in Bolivar. Apparently, the gang members were going to give Sutton a "violation." This meant that Sutton had violated gang rules and was either going to be hurt or killed as a result.

Thompson did not loan the gang members his car. However, later that afternoon, Thompson, Huber, and a female gang member picked up Sutton from his residence and drove him to Kirk's house. From the time they arrived at 1:45 p.m. until 9:30 p.m., no one mentioned the violation that was to be given to Sutton. Thompson left Kirk's house at 9:30 p.m. to pick up another female gang member, Libby Oliver, from her job in Buffalo. When Thompson left Kirk's house, people there were drinking and partying.

After Thompson picked up Oliver they returned to Kirk's house. En route to Kirk's, Thompson told Oliver that Sutton was going to get a violation.

When Thompson arrived at Kirk's at around 10:30 p.m., a gang member approached him and told him that he needed to open his trunk. Thompson gave the gang member the keys, and he opened the trunk. Mark Rich and Lillie White then removed everything from Thompson's trunk.

Thompson walked to the back of the house where he saw Sutton lying on the ground with a huge gash over his right eye. Sutton was bruised and bleeding. Thompson saw that Sutton was alive. Kirk, Huber, and Rich moved Sutton into the house and laid him on some towels.

Kirk took a black-handled, serrated knife from his kitchen and placed it in a

plastic sack and handed it to Mark Rich. Kirk told Rich to "finish it off."

Rich and Huber placed Sutton in the trunk of Thompson's car. Rich placed the plastic sack containing the knife in the glove compartment of the car. Thompson got into the driver's seat of his car and Rich and Huber got into the passenger compartment. Thompson drove the car away as the men looked for a place to dump Sutton's body.

At 11:00 p.m., Polk County Deputy Scott Grant initiated a traffic stop of Thompson. Thompson and the two other men in the car appeared to be calm and collected to Deputy Grant. Deputy Grant told Thompson that his license plate tab was in the wrong place. The deputy determined that there were no warrants for Thompson or Mark Rich and told Thompson that he was free to go. Thompson then drove east on Highway 32 toward Buffalo.

Upon reaching a low-water bridge over Lennley Creek off of Highway J in Dallas County, about four miles from Buffalo, Thompson stopped the car. Rich and Huber then removed Sutton from the trunk of the vehicle. Sutton was screaming. Huber stomped on Sutton's throat and his screaming stopped. Frightened that they heard someone coming, the men threw Sutton off the bridge and into the water and drove off.

Soon Thompson turned his car around and the men went back to the bridge. Huber went to Sutton and rolled him onto his back. Rich with a plastic bag covering his hand took the black-handled knife that was in the glove compartment of the car and cut Sutton's throat four or five times. The men rolled Sutton's body into the creek water. Rich then tossed the bag and knife into the water.

Thompson drove Rich and Huber back to Kirk's house. Rich threw his clothes into a dumpster. Thompson stayed the night at Kirk's house.

The next morning, a farmer saw Sutton's body in the creek water by the bridge and called the Dallas County Sheriff. Law enforcement officers located Sutton's body. Investigators determined that Sutton died from the deep cuts to his neck that severed both his jugular veins and ninety percent of his trachea. It was also determined that Sutton suffered a brain injury from the beatings that, left untreated, would have been fatal. Sutton's body was bruised, including defensive wounds on the back of his forearms. In addition, his body had a massive amount of swelling, deep scratches, and deep lacerations. Officers also found the knife and bag at the bridge near Sutton's body. Blood was not detected on the knife; however, the bag screened positive for the presence of blood.

Later that day officers observed Thompson in the driveway of Kirk's house washing his car using a fire hydrant and a bucket. They also saw him pouring liquid from a milk jug sized bottle on the back of his car. Upon investigation, law enforcement determined the trunk of Thompson's car had been cleaned with bleach.

Officers obtained a search warrant for Kirk's residence. In his home, they found packaging for a set of five Faberware knives, and four black-handled Faberware knives matching the knife found at the murder scene.

That evening, a Dallas County Sheriff's deputy interviewed Thompson. Thompson told the deputy about the events leading up to the murder of Sutton and about the murder. The following day, Thompson gave officers more details about the events surrounding Sutton's murder.

### Sufficiency Of The Evidence

Thompson first contends the trial court erred in overruling his motion for judg-

ment of acquittal based on insufficient evidence of deliberation upon the murder by Thompson. Thompson argues that evidence of personal deliberation cannot be proven by inference unless the defendant personally caused the victim's death.

The State responds that the trial court did not err when it overruled Thompson's motion for judgment of acquittal because there was sufficient evidence to support Thompson's conviction for murder under a theory of accomplice liability in that a reasonable juror could have inferred from the evidence that Thompson deliberated upon the murder of Sutton.

■ We must determine if the State presented sufficient evidence from which a reasonable juror could have found defendant guilty beyond a reasonable doubt. *State v. Bates,* 70 S.W.3d 532, 534 (Mo. App.2002). This standard of review requires that we:

> must look to the elements of the crime and consider each in turn. . . . [The Court is] required to take the evidence in the light most favorable to the State and to grant the State all the reasonable inferences from the evidence. [The Court] disregard[s] contrary inferences, unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them. Taking the evidence in this light, [the Court] consider[s] whether a reasonable juror could find each of the elements beyond a reasonable doubt.

*Id.* (citing *State v. Whalen,* 49 S.W.3d 181, 184 (Mo. banc 2001)).

■ In a case of first-degree murder involving accomplice liability, the jury must find that the defendant himself deliberated. *State v. Clemons,* 946 S.W.2d 206, 216 (Mo. banc 1997). *See also State v. O'Brien,* 857 S.W.2d 212, 217 (Mo. banc 1993). "While the act of homicide may be imputed to an accomplice, the element of deliberation may not be imputed by association." *Clemons,* 946 S.W.2d at 216.

Proof that a defendant merely aided another with the purpose of facilitating an intentional killing is not enough to prove first degree murder. To make its case, the state must introduce evidence from which a reasonable juror could conclude beyond a reasonable doubt that the defendant (1) committed acts that aided his codefendant in killing the victims; (2) defendant's conscious purpose in committing the acts was that the victims be killed, *and* (3) defendant committed the acts after coolly deliberating on the victims' deaths for some amount of time, no matter how short.

*Id.* (citing *O'Brien*).

In *State v. Gray,* 887 S.W.2d 369 (Mo. banc 1994), the Supreme Court outlined three circumstances highly relevant to determining whether accomplice liability may be inferred for first degree murder: first, the defendant or a co-defendant in the defendant's presence made a statement or exhibited conduct indicating an intent to kill prior to the murder; second, the defendant knew that a deadly weapon was to be used in the commission of a crime and that weapon was later used to kill the victim; and third, the defendant participated in the killing or continued with a criminal enterprise after it was apparent that the victim was to be killed. 887 S.W.2d at 376–77.

■ In the instant case, the State presented sufficient evidence of statements or conduct by the defendant or in the defendant's presence indicating a purpose to kill. The evidence in this case viewed to the light most favorable to the prosecution includes all three circumstances enumerated in *Gray,* as well as additional evidence from which a reasonable juror could have found beyond a reasonable doubt that ap-

pellant deliberated upon the death of Michael Sutton. Thompson told Libby Oliver on the evening of Sutton's murder that Sutton was going to get a violation. Thompson knew that getting a violation meant getting hurt or killed.

Thompson also saw Andrae Kirk wipe the knife off with a towel, put it in a plastic sack, hand the sack to Rich, and say, "finish it off." That knife was later used to kill Sutton. Rich used the knife to cut Sutton's throat four or five times. Doctor James Spindler, the pathologist who performed the autopsy of Sutton, testified that the cause of death to Sutton was the massive loss of blood from his sliced throat combined with aspiration of blood from the cut into his lungs. Although the doctor testified that, without medical treatment, Sutton's injuries to his brain would have caused his death, it was interrupted by the slicing of Sutton's throat which was "certainly the cause of death."

In addition, Thompson drove his car with Sutton in his trunk to the location of the murder. After the men left Sutton in the water and drove away for the first time, Thompson heard Rich say, "if he talks we're in trouble." Thompson then turned his car around and drove back to where they had left Sutton. It was then that Rich sliced Sutton's throat.

After it was apparent that Sutton was to be killed, Thompson continued with the criminal enterprise. He drove the car with Sutton in the trunk. When stopped by a law enforcement officer as he drove, Thompson did nothing to indicate to the officer that there was an injured man in the trunk who needed help.

Statements made in the defendant's presence and the defendant's actions indicated an intention to kill. Thompson continued to play an active role in the events that caused Sutton's death, even when it became clear that Sutton would be killed

with the knife. The evidence of deliberation in this case is substantial. The trial court did not err in overruling Thompson's motion for judgment of acquittal. This point is denied.

### Evidentiary Issues

Thompson raises three related evidentiary issues. A trial court typically has broad discretion in deciding whether to admit evidence and, as such, its decision will not be disturbed unless a clear abuse of discretion is shown. *State v. Williams*, 976 S.W.2d 1, 2 (Mo.App.1998). "The decision to admit evidence is an abuse of discretion where it 'is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration.'" *Id.* (quoting *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991)). Even assuming, *arguendo*, that the trial court did abuse its discretion in allowing the challenged evidence and, thus, erred, the appellant must show that it was reversible error to be entitled to appellate relief. *Id.* at 3. To show such error, the appellant must demonstrate not only that the admission of the challenged evidence was erroneous, but also that it was prejudicial. *State v. Masden*, 990 S.W.2d 190, 193 (Mo.App.1999). "'[A] conviction will be reversed due to admission of improper evidence only if the defendant proves prejudice by showing a reasonable probability that in the absence of such evidence the verdict would have been different.'" *State v. Evans*, 992 S.W.2d 275, 290 (Mo.App. 1999) (quoting *State v. Nastasio*, 957 S.W.2d 454, 459 (Mo.App.1997)).

Thompson complains about three related pieces of evidence: (1) the admission of a Missouri State Highway Patrol Crime laboratory report written by Joe Roberts because Roberts did not testify; (2) the court

allowing Brian Hoey to testify about the contents of Joe Roberts's report because Hoey had no direct knowledge as to the validity of the laboratory tests; and, (3) the court allowing Hoey to testify about the testing performed by Roberts because it was improper expert opinion in that it was based on the laboratory report admitted without proper foundation under the hearsay exception for an unavailable witness.

At trial, defense counsel objected to the admission of exhibit 19, the laboratory report written by Roberts about his testing of the black-handled knife and the plastic bag found at the murder scene for the presence of blood. Counsel objected that the report was cumulative because the witness had already testified about the blood results of the knife and plastic bag. Counsel also objected that the State had not laid proper foundation for Hoey to testify about the tests conducted by Roberts. The trial court determined that the report would not be published to the jury, instead stating that "only those parts of the report that he has referred to in his testimony will be admitted although the report itself will be available and is marked as the exhibit." The trial court clarified that the report would be available to defense counsel and to review by any other court.

Thompson complains on appeal that the report was hearsay and there was no foundation laid providing any exception to the hearsay rule. Specifically, appellant contends that there was no foundation laid for the premise that Roberts was an unavailable witness.

The appellant also complains that the trial court should not have allowed Hoey to testify about the contents of the report because he had no direct knowledge as a supervisor of the validity of the laboratory tests to which he testified. At trial, defense counsel objected that Hoey's testimony was hearsay. Defense counsel argued that:

> Although this witness is the supervising technician or supervisor to Mr. Joe Roberts. He is no longer in the state's employ. I believe that there is not a proper foundation that the witness has any independent knowledge, that he's merely testifying from a lab report prepared by somebody else and merely testifying what he thinks to be true, because he's using the report to ascertain, for example, when he said, I assume he's reading from the report to assume which tests are being conducted. So I would object to this question that was just asked and in addition to any questions on the content of any tests conducted by Mr. Joe Roberts. This specific question, do you know what tests were conducted by Mr. Joe Roberts, is what I think this question was. Specifically it's calling for hearsay. And he's referring to a report that wasn't written by him.

The State responded that there was a long series of cases in Missouri that allows one expert similarly qualified to testify from the report of another, assuming they are familiar with the qualifications of the person whose report they are reading and that they are familiar with the tests themselves. The trial court overruled defense counsel's objection.

Thompson also complains that the trial court erred in allowing the testimony of Hoey regarding the testing by Joe Roberts because it was improper expert opinion and was based on the report admitted without proper foundation under the hearsay exception for an unavailable witness. Thompson does not identify *which* hearsay exception for an unavailable witness for which it expected the State to lay a foundation.

■ Roberts's laboratory report and Hoey's testimony regarding the report met the requirements for the "business records exception" to the hearsay rule. *See* § 490.680, RSMo. The "business records exception" allows for the admission of hearsay where the evidence is:

> A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such to justify its admission.

§ 490.680.

Hoey testified that he had supervisory responsibility over Roberts at the Missouri State Highway Patrol Crime Laboratory. He explained what Roberts' duties were at the laboratory. Hoey testified that Roberts was qualified to perform the type of examination the report was based on. Hoey testified that he was qualified in the same areas as Roberts. Hoey testified that Roberts serology testing of the knife and plastic bag were done under his supervision. Hoey explained the types of tests that Roberts performed on the items.

■ The preparer of a laboratory report himself need not establish its foundation at trial. *See State v. Hall,* 750 S.W.2d 637, 639 (Mo.App.1988) (*citing State v. Merritt,* 591 S.W.2d 107, 113 (Mo.App. 1979)). "There is no question under the law that opinions of experts contained in a laboratory report prepared by that expert are admissible without the presence of and testimony of the expert himself.... The authorities generally agree that it would be impractical to set any absolute standard as to the qualifications of an expert witness; and that of necessity the question must rest largely in the sound discretion of the trial court." *Id.* (citations omitted).

The testimony of Hoey was sufficient to establish the qualifications of himself and Roberts as experts in serology testing and to satisfy the requirements of the "business records exception" to the hearsay rule. The trial court did not abuse its discretion in admitting the report and Hoey's testimony.

## Instructional Error

Thompson raises two claims of instructional error. We address each, in turn.

### Instruction Number Five: Accessory Liability Instruction

Thompson next contends the trial court erred in submitting instruction number five to the jury because the accomplice liability language was stated in the disjunctive and permitted jurors to reach a verdict that was not unanimous. Jury instruction number five reads as follows:

> A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he **acts with** the other persons with the common purpose of committing that offense **or** if, for the purpose of committing that offense, he **aids or encourages** the other persons in committing it.

(Emphasis added). Instruction number five is patterned on the introductory paragraph of MAI–CR 3d 304.04.

Thompson argues that based on the instruction some of the jurors could find guilt based on "acting together with" and others could find guilt based on "aids or encourages." At trial, defense counsel objected to the trial court giving instruction number five in its form because it "specifically referrers [sic] to disjunctive, it has disjunctive element." The State responds

that the trial court did not err when it submitted instruction number five to the jury because it was a definition instruction that explained accomplice liability and complied with MAI–CR 3d 304.04. The State further argues that its use of disjunctive language was proper and that it did not prejudice Thompson. Before the trial court, the State argued that the language was mandatory from the statute on accessory liability and was proper. The trial court overruled defense counsel's objection and indicated that the instruction was in the form required by the MAI and that the verdict director was not in the disjunctive.

Thompson's argument is based on his contention that he was not present or a participant "in the beating that was a cause of Mr. Sutton's death." Thompson argues that, because of "his late arrival on the scene and participation only after that point, there is a genuine issue regarding whether Mr. Thompson acted together with the killers in doing anything other than trying to cover up the homicide." However, as discussed above, the State's evidence showed that the immediate cause of Mr. Sutton's death was the slashing of his throat at which time Thompson was present and involved. Nevertheless, Thompson argues that there was no evidentiary support for the claim that he acted together with others in causing the homicide.

MAI–CR 3d 304.04 applies when the evidence shows that the defendant acted with or aided another person or persons in the commission of an offense. *See* MAI–CR 3d 304.04, Notes on Use 4. The introductory paragraph of that instruction simply explains to the jury the nature of accessorial liability. In instruction number five, accessory liability was only defined and an alternative was not required to be selected. The appellant's claim that

he suffered prejudice from instruction five is that it confused the jury in that it may have caused them to come to a verdict that may not have been unanimous.

■ In *State v. Davis,* 963 S.W.2d 317, 323 (Mo.App.1997), this Court held that the jury need only be unanimous as to the ultimate issue of the defendant's guilt or innocence of the crime charged. The jury need not be unanimous as the means by which the crime was committed. *Id.* (citing *State v. Hill,* 884 S.W.2d 69, 74 (Mo. App.1994)). Instruction number five conformed to MAI–CR 3d 304.04 and the trial court did not commit error in giving instruction five. Point denied.

### Instruction Number Six: The Verdict Director

In the instant case, juror instruction number six, the verdict director, also followed MAI–CR 3d 304.04 and selected only one alternative, "aided or encouraged." Instruction number six stated (emphasis added):

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about August 17, 1998, in the County of Dallas, State of Missouri, the *defendant or other persons* caused the death of Michael Sutton by striking him, kicking him and cutting his throat, and

Second, that defendant or other persons knew or were aware that their conduct was causing or was practically certain to cause the death of Michael Sutton, and

Third, that defendant or other persons did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,

then you are instructed that the offense of murder in the first degree has oc-

curred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the death of Michael Sutton *the defendant aided or encouraged other persons* in causing the death of Michael Sutton and did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief then you will find the defendant guilty of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

If you do find the defendant guilty of murder in the first degree, you are to assess and declare the punishment at imprisonment for life without eligibility for probation or parole.

Thompson contends the trial erred in submitting this instruction to the jury because the disjunctive verdict directing language permitted jurors to reach a verdict without evidence that Thompson committed the essential elements of the offense, in that the instruction hypothesized that Thompson *or* others killed the victim.

The State argues that the language that "the defendant or other persons caused the death of Sutton" was not an improper disjunctive submission because it was supported by the evidence and, alternatively, that Thompson could not have been prejudiced by the language. Ultimately, the State argues that the instruction did not mislead the jurors into finding Thompson guilty. Defense counsel raised the following objection to instruction number six:

Judge, the objection is to the first, second and third paragraphs where they say the defendant or other persons, and that language consistent in the first

three paragraphs. I object to that because the MAI 304.04, the notes on use, the defendant's responsibility for conduct of another person. In the fifth note in subparagraph A, it says where the conduct, elements are committed entirely by another person or persons, if you have such a case then all of the elements of the offense should describe the other person or persons and not the defendant. And I think that the language in the first three paragraphs needs to remove the defendant from that language to comply with MAI.

The prosecutor responded that he believed the instruction was proper on the basis that the evidence suggested that Thompson was an active participant in at least one element of the crime, as set out in paragraphs First through Third. The trial court ultimately overruled the defendant's objection and submitted the verdict director to the jury, unchanged.

The State recognized that Thompson's liability was based, at least in part, on his being an aider and abettor to the crime of first-degree murder. This recognition is based in part on the State's proposed Instruction Number Five, discussed above, which is given as a separate instruction only when all verdict directors are based on accessorial liability. *See* MAI–CR 3d 304.04, Notes on Use 3. The State further recognized the distinctions created under accessorial liability by modifying paragraph Fourth of the verdict director in accordance with the MAI–CR 304.04 form instruction, which provides:

[T]hat with the purpose of promoting or furthering the commission of that [*name of offense*] the defendant (acted together with) (aided or encouraged) (acted together with or aided) [*name(s) of other person(s) or, if unknown, a general identification of the other(s) involved such as "another person," "other per-*

*son(s)," etc.*] in committing that offense[.]

The State, in the paragraph Fourth of instruction six chose the language "aided or encouraged."

Thompson's precise objection is to paragraph First of the instruction, on the basis that it was not consistent with paragraph Fourth because the former submits that Thompson *or* other persons caused the death by striking, kicking, and cutting the victim's throat. Thompson submits that there was no evidence to support a submission that he committed any of the conduct elements of first degree murder and that under the evidence he could only be held responsible under a theory of accessorial liability.

The notes on use for MAI–Cr 3d 304.04 posit four usual situations where liability of the defendant is based in part upon imputations to the conduct of some other person: (1) Defendant committed no conduct elements of the offense and is liable solely on the bases that he aided the other person(s). (2) defendant and the other person(s) jointly committed the offense (3) the evidence is not clear or conflicts as whether the defendant simply aided or acted jointly by committing some or all of the conduct elements of the offense. (4) defendant committed all of the conduct elements of the offense and someone else aided or acted with the defendant.[1]

MAI–Cr 3d 304.04, Note on Use 5, provides that the verdict director "will be modified to attribute these [conduct] elements [of the offense] to the other person or persons and the defendant as supported by the evidence." That note on use, thereafter, sets forth four modifications (labeled (a) through (d)) to the verdict director

based on the four most common scenarios discussed above. It is clear, and the parties do not disagree, that the fourth scenario (Note on Use 5(d)) does not apply.

Instruction number six, as submitted by the State, modified the verdict director in partial accordance with Notes on Use. At the instruction conference, Thompson specifically objected to Instruction number six and argued that it needed to be modified in accord with Note on Use 5(a) for situations where the defendant is only an aider and abettor. The prosecutor responded that he believed the instruction to be proper saying, "And while I think the evidence may indicate that certain acts were committed by other persons *the evidence also indicates that the defendant is an active participant in one or more of these elements of the crime.*" (Emphasis added).

The prosecutor did not explain what element(s) of first-degree murder the defendant committed. Nor did he suggest that the evidence was not clear or was in conflict as to whether the conduct elements of the first-degree murder were committed by the defendant (the Note on Use 5(c) scenario). In addition, the prosecutor's closing argument did not support such a view. In closing, the prosecutor argued that Thompson did not strike the death blows himself, but rather that other people committed those acts. Now, on appeal, the State does not argue that there is any evidence indicating that Thompson committed any of the conduct elements of first degree murder. Rather the State argues that the evidence was unclear or conflicting as to who committed those elements and that, therefore, Note on Use 5(c) supports the instruction given.

MAI–CR 3d 304.04, Note on Use 5(c), indicates the form of the instruction to be

---

1. Although Notes on Use 4 indicates there are an infinite variety of factual situations of accessorial ability, there is no claim here that something other than the most usual discussed herein was present.

given "where it is not clear whether the conduct elements were committed by the defendant or another person":

> Where the evidence is not clear or conflicts as to which person (in a group including the defendant) engaged in the conduct constituting the offense, then
>
> (1) those conduct elements of the offense should be ascribed to the defendant *or* the other person or persons, and
>
> (2) select one of the alternatives such as "acted together with or aided" in the paragraph following "then you are instructed that the offense of [*name of offense*] has occurred . . . ."

The State does not address the inconsistency, however, of using the 5(c) modification in paragraph First of the verdict director but then using the 5(a) modification in paragraph Fourth.

 On appeal, the State ultimately argues that there was no error in Instruction Six because under *State v. Dulany,* 781 S.W.2d 52 (Mo. banc 1989), the jury could disbelieve all or parts of Thompson's testimony and find that he committed the conduct elements. We disagree. Based on the evidence presented by the State, Note on Use 5(a) should have been followed rather than Note on Use 5(c). The State only presented evidence that showed the defendant aided others in carrying out the crime. "The basic principle applicable to the submission of instructions is that they should not be given if there is no evidence to support them. Instructions must be supported by substantial evidence and reasonable inferences to be drawn therefrom. Instructions which are at variance with the charge or which are broader in scope than the evidence are improper unless it is shown that an accused is not prejudiced thereby." *State v. Daugherty,* 631 S.W.2d 637, 639–40 (Mo.1982) (internal citations omitted) (*overruled on other*

*grounds by State v. Baker,* 636 S.W.2d 902, 904 (Mo. banc 1982)).

The State contends that facts identical to the instant case were present in *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989), and that *Dulany* is controlling. In that case, the defendant was convicted of two counts of capital murder when she and her boyfriend, Ronnie Lee Conn, were involved in murdering Conn's aunt and uncle. The case was tried under the accomplice liability theory. Dulany claimed that there was insufficient evidence for a jury to find that she committed the act where the jury was instructed that Conn *or* Dulany committed the acts. Dulany confessed to the police twice, each time naming a different person responsible for the killings but exculpating herself. *Id.* at 55.

In *Dulany,* the Supreme Court noted that the jury is not bound by a defendant's self-serving explanation. *Id.* (citing *State v. Clark,* 494 S.W.2d 26, 29 (Mo. banc 1973)). The Court found that "[t]he jury could properly disbelieve defendant and find that she committed these acts." *Id.* at 56. Therefore, the Court found no error in the disjunctive instruction. *Id.*

The Court went further and indicated that "[e]ven if there had not been enough evidence for the jury to find the defendant committed the acts, the disjunctive submission would not have been reversible error." *Id.* The Court cited cases standing for the proposition that, when an aider is found to have purposely aided in capital murder and thus has the same intent of the active participant, all other things being equal, they are liable to the same degree as the active participant. *See id.* (citing *State v. White,* 622 S.W.2d 939, 945 (Mo. banc 1981)). The Court indicated that Dulany's admitted affirmative actions advanced the criminal enterprise and rendered her just as guilty as if she alone committed the

acts. *See id.* (citing *State v. Barnes*, 708 S.W.2d 270, 273 (Mo.App.1986)).

Then, the Court noted that the MAI–CR 2d 2.12 Note on Use 6(d) contained a self-limitation that any variation in ascribing the elements of an offense to the defendant or to the other person or persons ... shall not be deemed reversible error in the absence of prejudice. *Dulany* at 56.[2] The Supreme Court held that, under the facts of *Dulany*, no prejudice could result from the disjunctive submission because the jury could only find the defendant guilty if she committed the crime or if she acted together with or aided Conn to commit the elements of the crime. The Court held that her contention that there was no evidence that she participated other than as an accomplice was without merit because a finding that she was a principal could be amply supported. *Id.*

The instant case is distinguishable from *Dulany.* In *Dulany*, the defendant confessed twice to police each time claiming a different person was responsible for the killings. *Id.* at 55. In addition to the two prior statements made to police by the defendant, the jury had physical evidence, defendant's trial testimony, and the deposition of another participant in the crimes. *Id.* at 53. Here, the State presented the two consistent statements of Thompson in its case in chief and relied on Thompson's statements to prove its case that he was an accomplice to first degree murder. The State did not contradict Thompson's statements and argued his version to the jury. It was clear in this case, based on the State's own evidence, that the conduct elements were committed entirely by another person or persons. We do not read *Dulany* as standing for the proposition that a jury's right to disbelieve evidence can create affirmative evidence of the performance of a criminal act where the evidence is not contradictory or inconsistent. In *Dulany*, the defendant admitted holding a gun on the victims, getting a rope to bind them, and removing from the house the empty cans of roofing cement used to set the victims on fire. *Id.* at 55. She gave two contradictory confessions accusing two different persons of actually binding the victims and setting the fire. In her last confession she admitted that only she and the other co-defendant were actually in the house when the victims were murdered. *Id.* at 54. We do not believe the Supreme Court intended to suggest that the possibility of juror rejection of evidence would always support an MAI–CR 3d 303.04 submission of a disjunctive submission of the conduct elements of the crime.

▇▇▇▇▇ "The purpose of the disjunctive instruction is to give the jury the opportunity to consider evidence that is unclear." *Id.* There is no lack of clarity in this case. A basic principle to criminal instructions is that they should not be given if there is no evidence to support them. *Daugherty*, 631 S.W.2d at 639. More importantly, Rule 28.02(f) provides that the giving of an instruction in violation of MAI–CR 3d or any applicable Notes on Use is error. This principle has been applied by the Supreme Court to an accessory liability verdict director under MAI–CR 3d 304.04. In *State v. Caldwell*, 956 S.W.2d 265, 267 (Mo. banc 1997), the State's verdict director for first degree murder used the language that the defendant "acted together with, aided or encouraged" another person in causing the death. In *Caldwell*, that disjunctive language was used in paragraph Fourth of the instruction (the accessory and premeditation

---

**2.** This provision was removed from the Notes on Use after *Dulany* and long before the trial of this case. MAI–CR 3d does not explain its removal but the same consideration of prejudice, even after a finding of instructional error, is mandated by Rule 28.02(f).

paragraph in a first-degree murder case), rather than, as here, in paragraph First (the murder conduct paragraph). The court in *Caldwell* held that it had a type of case based purely on accessory liability and "thus, the instruction as given does not follow the Notes on Use." *Id.* We perceive no less error in an improper submission under paragraph first than under paragraph fourth of MAI–CR 3d 304.04. There was no evidence to support giving instruction number six in the disjunctive: "defendant *or* other persons caused the death by striking, kicking and cutting the throat." As in *Caldwell*, there was no evidence that Thompson committed any of the conduct elements of first degree murder. It was improper for the court to give this instruction. Its deviation from the Notes on Use is "patent" and was legally erroneous. Nevertheless, the error is grounds for reversal only if prejudice is shown. *Id. See also* Rule 28.02(f).

■ Whether this improper instruction requires reversal must be determined. Even though an instruction is erroneously submitted, we reverse only if we find prejudice to the defendant. *State v. Taylor*, 944 S.W.2d 925, 936 (Mo. banc 1997). A defendant is prejudiced by an erroneous instruction when the jury may have been adversely influenced by it. *State v. Caldwell*, 956 S.W.2d 265, 267 (Mo. banc 1997). Prejudice from an erroneous instruction can be found where the potential exists for misleading or confusing the jury. *State v. Green*, 812 S.W.2d 779, 787 (Mo.App.1991).

In *State v. Cox*, 820 S.W.2d 532, 536 (Mo.App.1991), this Court held that the disjunctive submission, "defendant or other persons" was not reversible error where there was insufficient evidence for the jury to have found the appellant actually committed the criminal conduct act. "From the evidence adduced at trial taken in a light most favorable to the state, the jury could reasonably infer that appellant's actions before during and after the murder of the victim manifested his complicity. . . . The direct and circumstantial evidence, when reviewed in its totality, reflects that appellant's own actions advanced the criminal enterprise as if he alone committed the acts." *Id.* (*citing State v. Franks*, 793 S.W.2d 543, 549 (Mo.App.1990)). *Cox*, as the State argues, rejects the proposition that prejudice can be shown because the disjunctive language permits a less than unanimous verdict:

> Unanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged, and unanimity is not required with respect to the alternative means or ways in which the crime can be committed. . . . [I]t is sufficient that all jurors unanimously agree on their ultimate conclusion that the defendant was guilty of the crime charged, though they may not agree on the manner in which the defendant participated in the crime if under any of the alternative ways the defendant would be guilty of the crime charged. To permit any other conclusion would be to permit the guilty defendant to escape accountability under the law because jurors could not unanimously choose beyond a reasonable doubt which of several alternate ways the defendant actually participated, even though all agree that he was, in fact, a participant.

*Id.* at 537. (quoting *Holland v. State*, 91 Wis.2d 134, 280 N.W.2d 288, 292–93 (1979), *cert. denied*, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980)). The State also contends that the prosecutor's closing argument does not supply the prejudice element as in *State v. Sparks*, 701 S.W.2d 731 (Mo.App.1985).

■ Here, however, Thompson argues additional prejudice. The prosecution pre-

sented evidence that the victim had received what would have been, untreated, a fatal beating at the house but that the immediate cause of death was the slitting of his throat after Thompson drove the victim and two other gang members out into the countryside. There was no evidence and, in fact, all of the evidence was to the contrary that Thompson had any involvement as a principal or abettor in the beating. Although there was some evidence that defendant knew in advance that Sutton was going to get a "violation," there was no evidence that Thompson participated directly or indirectly in that portion of the "violation." Nor did the prosecution in closing argument attempt to distinguish between any "striking" or "kicking" that occurred at the house or later on the bridge. Under these circumstances the jury was allowed to speculate as to whether Thompson struck or kicked the victim at the house. *Sparks,* 701 S.W.2d at 734.

We are persuaded that the failure to follow the Notes on Use under the facts of this case was error, *State v. Jones,* 930 S.W.2d 453, 455 (Mo.App.1996), and that the error was prejudicial, requiring a new trial.

### *Ex Parte* Communication

Thompson contends the trial court erred in allowing the State to engage in ex parte communications with the court during the trial and engaging in prohibited conduct in front of the jury thereby prejudicing the jury against the defendant. Specifically appellant complains that the State gave the judge a copy of its witness list but refused to give a copy to defense counsel. The following exchange took place during the trial:

> Mr. Ahsens [Prosecutor]: Offer State's Exhibits 5 and 6.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HELD)

Ms. Benjamin [Defense Counsel]: Two objections to 5 and 6. One is, cumulative and two, I believe number 3 that's also a picture, or 4, whichever the other picture was, 4—I don't have that evidence list by the name.

Mr. Ahsens: You won't get one.

Ms. Benjamin: Why not?

Mr. Ahsens: Because it is mine?

Ms. Benjamin: Courtesy?

Mr. Ahsens: No.

Ms. Benjamin: Why not?

Mr. Ahsens: Because I said?

Ms. Benjamin: Don't know what your number of exhibits are until you show them to me.

Mr. Ahsens: You have seen them.

The Court: Which one are you talking about now?

Ms. Benjamin: I'm speaking about number 4, I think. I observed an exhibit list similar to what you are using.

The Court: Do you have an exhibit list?

Ms. Benjamin: No, I don't.

The Court: Well, this is the state's, the one the state prepared, has to do with their exhibits?

Ms. Benjamin: Since one went to the court I assume I would get one too?

Mr. Ahsens: Not necessarily, for the benefit of the Court, not for yours.

The Court: Only one I got, I'm using it.

■ We address this point, not only for the reason that it should not be permitted to recur at retrial, but also to discourage counsel in future cases from participating in conduct that we perceive as highly unprofessional. The Rules of Professional Conduct are not a ceiling of behavior but the bare minimum that is to be expected from the legal profession. We also encourage trial judges not to permit or condone such practices.

## Conclusion

The State presented sufficient evidence to support the elements of the first-degree murder charge against Thompson to permit the charge to be submitted to the jury. The trial court, then did not err in denying Thompson's motion for judgment of acquittal. No error was committed by the trial court by admitting into evidence the laboratory report concerning tests upon the alleged murder weapon and bag it was found within, testimony of the lab technician's supervisor regarding the contents of that report, or the nature of the testing performed.

With regard to the instructional issues, we conclude that the trial court did not err by submitting instruction number five, which provided a general definition of accomplice liability. However, we find that the trial court erred in its submission of the State's verdict director. That instruction improperly submitted the issue that Thompson had committed one of the conduct elements of the offense, as that submission was not supported by substantial evidence. That error was prejudicial and requires reversal and remand for retrial.

Because we believe that Thompson's remaining points of error are either unlikely to reoccur at retrial or can be properly preserved, rather than raised as plain error, we need not address them here. The judgment of the trial court is therefore reversed, and the action remanded for further proceedings consistent with this opinion.

JAMES M. SMART JR., Presiding Judge, and ROBERT G. ULRICH, Judge, concur.